BARRY KLEISS *et al.*, d/b/a Kleiss Berry Farm, Plaintiffs-Appellants, v. JERALD CASSIDA, a/k/a Jerry Cassida, *et al.*, Defendants-Appellees (James Fish *et al.*, d/b/a Custom Spray Service, *et al.*, Defendants).

Fourth District   No. 4—97—0604

Argued May 19, 1998.—Opinion filed June 26, 1998.

166.

David Stevens (argued), of Heller, Holmes & Associates, P.C., of Mattoon, for appellants.

Mark E. Jackson and Rhonda R. Heinz (argued), both of Samuels, Miller, Schroeder, Jackson & Sly, of Decatur, for appellee Jerald Cassida.

S. Craig Smith (argued), of Asher, Smith & Isaf, of Paris, for appellee Sandoz Crop Protection Corporation.

JUSTICE COOK delivered the opinion of the court:

Plaintiffs, Barry and Carolyn Kleiss, farm 185 acres of grain crops, fruits, and vegetables in Douglas County. They filed this suit contending they suffered crop damage in 1990. Plaintiffs alleged two separate sprayings of herbicides on nearby farms, one by defendant Jerald Cassida (Cassida) and one by Fish and Hudson Custom Spray Service (Fish and Hudson), damaged their crops because the herbicides contained dicamba. Dicamba, a plant growth regulator, is a chemical used by farmers to kill weeds. It is the active ingredient in two different herbicides, Banvel and Marksman. Defendant Sandoz Crop Protection Corporation (Sandoz) is the sole manufacturer of dicamba.

Designed to kill broadleaf weeds, dicamba can also damage broadleaf crops, by causing cupping of the leaves, and curling and twisting of the stems, if it comes into contact with them. Excluding a direct application, dicamba can come into contact with broadleaf plants in two ways: spray drift and volatilization. High temperatures, wind, and the manner of application affect spray drift and volatilization. Spray drift occurs as a result of the conditions during the application of dicamba. Under some circumstances, droplets of spray containing dicamba will move off the spray target area, blow through the air, and land on

plants outside of the target area. Volatilization is associated with conditions after the application of dicamba. After the chemical is applied to the target area, under some conditions, it will become a vapor and deposit on plants outside the target area.

Barry Kleiss first noticed damage to his crops on April 27, 1990. All the crops and fruit trees on his farm showed leaf cupping, discoloration, and twisted stems. Kleiss believed the crops suffered from dicamba damage. Around April 30, 1990, Kleiss phoned Steven Sturgeon from the Illinois Department of Agriculture (Department), and Dale Bateman, a consultant for Kleiss, complaining of dicamba damage to his crops. He asked the Department to investigate the source of the injury affecting his crops. Both Sturgeon and Bateman visited Kleiss' farm several times in 1990.

In May 1990, Kleiss noticed the green beans on his farm quit growing, as well as some cupping, crinkling, and discoloration of the leaves. Some of the crops were starting to recover after this time, but additional damage began to appear around June 1, 1990. On June 14, 1990, Kleiss observed cupping and discoloration of leaves, and twisting of stems on virtually all of his crops. On June 29, 1990, Kleiss noticed that injury to the crops was more visible and new growth showed leaf cupping. He believed the source of the dicamba damage came from an area to the south of his field since the plants at the south end of his field were smaller than those at the north end.

Kleiss used a number of herbicides on his farm in 1990, including Lasso, Roundup, Duel and 2-4-D. Kleiss had no record of his own chemical use in 1990, but testified he did not use dicamba on his farm. He believed the chemicals he did use do not cause the symptoms he described as dicamba damage. He admitted his crops, in addition to dicamba damage, also had wind damage, environmental, mechanical, and bacterial problems, scorching, seedling blight, nitrogen deficiency, and powdery mildew. However, he did not believe he had a loss of yield due to any of those factors or individual error.

On April 26, 1990, from about 7 a.m. to 2:30 p.m., defendant Cassida sprayed an 80-acre cornfield (Findley 80), whose northern boundary is located one mile to the south of the southern boundary of Kleiss' farm, with a mixture that included Banvel. The concentration of Banvel in the mix was .17 pounds per acre, well within the recommended label rate of .5 to 1.0 pounds per acre. Cassida testified the spray booms were as low to the ground as possible, and he used a nozzle that produced a coarse spray, all to prevent spray drift.

It was Cassida's practice, from which he did not deviate on April 26, to read and follow the Banvel labels on proper use of the product. Spraying Banvel is not recommended when it is too hot (above 85

degrees) or too windy (more than 5 miles per hour), or if sensitive crops, including broadleaf plants, fruits, and vegetables, are nearby. Cassida understood "nearby" to mean in the next field or within a quarter of a mile.

Cassida did not consider it too windy to spray, nor did he believe the temperature exceeded 85 degrees on April 26. However, wind and temperature information gathered from two Champaign County locations for April 26 indicated that on that date wind speeds at the two locations ranged from 6.2 to 28.7 miles per hour from the south or southwest. Temperatures ranged from 70 degrees at 7 a.m. to 85 degrees at noon.

Cassida knew Kleiss had a farm to the north but did not consider it to be in the nearby area. Cassida experienced spray drift before, but the farthest he had known it to go was around 600 feet.

Another herbicide spraying occurred on May 31, 1990, when Steven Miller, an employee of defendant Fish and Hudson sprayed a cornfield (Deavers 40), located about one-quarter mile southeast of Kleiss' farm, with a mixture containing Marksman. Miller believed the wind was blowing about 5 miles per hour and the temperature was less than 85 degrees that day. He was aware of label precautions warning about drift, temperature, and applying the herbicide near sensitive crops. Miller's experience was that dicamba could drift from 300 to 500 feet.

As a result of these two sprayings, and the alleged dicamba damage to their crops, plaintiffs filed suit against several parties. Count I of their complaint alleged that on April 26, 1990, Cassida negligently sprayed Banvel on the Findley 80, which damaged plaintiffs' crops. Counts II through IV alleged Fish and Hudson and Illini F.S. were negligent in spraying Marksman on the Deavers 40 around May 24, 1990, which damaged plaintiffs' crops. Counts VI and VII were brought against Sandoz. Count VI alleged strict product liability in tort in that Sandoz exclusively produced and distributed Marksman and Banvel, "unreasonably dangerous" products that damaged plaintiffs' crops. Count VII alleged wilful and wanton misconduct in Sandoz's manufacturing, selling, and distributing the herbicides. A jury trial began on January 30, 1997. In addition to the foregoing evidence, the following testimony was presented at trial.

Steven Sturgeon, a plant and pesticide specialist for the Illinois Department of Agriculture, was unable to determine the cause or the source of injury to Kleiss' crops after visiting the farm on numerous occasions in 1990. He did not positively know if chemical damage was the cause, much less if Banvel or Marksman was involved. The damage he observed could have been caused by environmental factors. He

also found at least three or four dicamba sprayings took place on farms in the area around the time Kleiss began to experience difficulty with his crops.

Dr. Malcolm Shurtleff, an extension plant pathologist at the University of Illinois with a Ph.D. in plant pathology, had seen spray drift that travelled several miles and damaged plants. Shurtleff did not elaborate as to what conditions were necessary for spray to drift several miles or whether the spray was capable of causing damage after such a drift. Dr. Shurtleff did not visit Kleiss' farm in 1990; he only examined photos of the crops. It was his opinion to a reasonable degree of scientific certainty that the main cause of the damage he observed in the photos, including cupping of leaves and twisting of stems, was caused by plant growth regulator. However, he found Kleiss' plants to be suffering from a wide variety of injuries. Dr. Shurtleff testified that there was no way to tell what plant growth regulator was involved without a chemical analysis, and even if the chemical was dicamba, there was no way to be sure whether it was in the form of Banvel or Marksman. He could not give an opinion as to the source of the damage; however, he believed there would have had to have been multiple exposures in this case. The damage he saw in the photos would affect yield.

Dale Bateman, a retired University of Illinois extension advisor in agriculture for Douglas County, worked as a chemical damage consultant for Kleiss. Bateman visited Kleiss' farm on April 30, June 11, and June 14, 1990, and observed cupping of leaves, as well as color changes on the leaves of the crops. On June 30, Bateman observed more severe damage on the south side than the north side of the farm indicating a chemical coming from the south.

Bateman gave several opinions, which he stated were within a reasonable degree of agricultural certainty. He provided no reasoned analysis for any of his conclusions, supporting them only based on his work experience. Bateman concluded, "from [his] experience in the 30 some years of investigating crops," that the injuries he observed to Kleiss' crops in 1990 were caused by dicamba, found in Banvel and Marksman, and that there was more than one exposure of dicamba to Kleiss' crops in 1990. Bateman did notice damage that may have been caused by factors including wind or insects, but the overriding injury resulted from airborne contaminants. He concluded Kleiss suffered economic loss as a result of the damage to the crops.

Bateman also testified that dicamba can drift up to two miles and still have the effects he observed on Kleiss' crops. The sole basis for that opinion was his "experience in the 30—over 20 to 25 year period with dicamba." On cross-examination, the following exchange took place:

"Q. Now, I think you indicated you had an opinion on drift, that drift could go two miles, is that correct?

A. That's correct.

Q. You have any written documentation to support your opinion, or was this your experience?

A. My experience.

Q. Okay. No written documentation, right?

A. Right."

Bateman was not aware of nor had he conducted any research regarding how far dicamba could drift.

Bateman also concluded the information contained on the Banvel and Marksman labels was not specific enough. Both labels stated the product should not be sprayed near, in the vicinity, or if the wind is moving in the direction of nearby sensitive crops, but neither defined what "nearby" or "in the vicinity" meant. Bateman was questioned:

"Q. What, in your background and your experience, has led you to form the opinion that you have? ***

A. 20 years of experience in the field—20 years of field experience."

Bateman's training in labelling consisted of label interpretation, rather than label preparation.

It was also his opinion based on his 20 years' experience that Marksman and Banvel were unreasonably dangerous products as manufactured and entered into the stream of commerce by Sandoz. Bateman gave no explanation for this opinion.

Dr. Richard Wilson holds a Ph.D. in plant physiology and is a former employee of Sandoz. He has researched off-target drift of pesticides for over 18 years and is a member of the Spray Drift Task Force (SDTF), an organization that completed a study of pesticide drift in 1996. Wilson authored a 1996 report on Banvel drift and volatilization based on a literature review, SDTF results, and his own research. The farthest that SDTF studies detected dicamba spray drift, under extreme conditions (spray boom high from the ground, high winds, and a nozzle producing many small droplets), was 600 feet off target downwind. Wilson was familiar with about 2,000 scientific articles on spray drift, and none allowed for the possibility of drift as far as a mile away.

Wilson also studied volatility. Under extreme conditions, 20 feet downwind was the farthest Wilson could measure any chemical. Based on a reasonable degree of scientific certainty, 20 feet downwind is as far as volatility can be measured and injury to a plant occurs only at less than 20 feet.

Wilson also calculated what the spray drift would have been under

the conditions when Cassida sprayed on April 26, 1990, and concluded no spray drift would have deposited dicamba beyond 200 to 300 feet downwind. It was his opinion to a reasonable degree of scientific certainty that none of the spraying done by Cassida could have drifted or volatized to cause damage to Kleiss' farm, located 1 to 1½ miles north of where Cassida sprayed. It was impossible for Kleiss' plants to have sustained damage from spray drift from one mile off target, or even from one-quarter mile off target.

Wilson, who had established contents of labels, was of the opinion to a reasonable degree of scientific certainty that both the Marksman and Banvel labels properly instruct the end user on the proper and safe use of the product. The labels adequately inform the user as to any potential problems regarding drift and volatilization.

Wilson also gave his opinion to a reasonable degree of scientific certainty that neither Marksman nor Banvel is an unreasonably dangerous product. He explained both are very safe to use, when used in accordance with the descriptions on the label. Both must pass an extensive series of studies with the United States Environmental Protection Agency (EPA) as well as within the State of Illinois.

James Wargo, manager of technical services for Sandoz, testified to the contents of the Banvel and Marksman labels in effect in 1990. Both labels listed precautions to follow when applying the product. The labels provided the products should not be applied when particles may be carried by air currents to the area where sensitive crops are growing, if the wind is gusty or in excess of five miles per hour and moving in the direction of nearby sensitive crops, or when the temperature on the day of application is over 85 degrees. Wargo believed "in the vicinity of sensitive crops" meant a field adjacent to sensitive crops. Wargo also explained that both the Marksman and Banvel labels were approved by the EPA and had undergone more than 120 tests before they were registered.

Wargo also testified that dicamba in either Marksman or Banvel form is subject to both wind drift and volatilization. However, Wargo believed the distance dicamba can travel off target is limited to 500 to 600 feet. He had never received a complaint that damage occurred when it was sprayed from a mile way, and he had never found any damage from a quarter-mile away.

Dr. Bruce Fulling, an agriculture researcher with a Ph.D. in plant pathology, conducted a study on the effects of off-target movement of dicamba on tomato crops, after being contacted by Sandoz. To a reasonable degree of scientific certainty, Fulling was of the opinion that Kleiss would not have experienced a loss in yield to his tomato plants if Kleiss had an exposure of dicamba at the same rate as Fulling

employed in his tests. Fulling also gave his opinion that a plant can have foliar injury earlier in the season that does not affect yield at the end of the season. He also explained that a number of symptoms caused either by disease or environment are similar to symptoms caused by exposure to dicamba.

At the completion of the trial, the jury returned verdicts in favor of plaintiffs. The jury found for plaintiffs and against Cassida on the negligence count, but awarded no damages. The jury also found for plaintiffs and against Fish and Hudson and Illini F.S. The jury assessed plaintiffs' damages at $35,000, reduced by 50% due to plaintiffs' comparative negligence, for a total damage award of $17,500. The jury found for plaintiffs and against Sandoz on count VI (strict liability), but for Sandoz on count VII (willful and wanton), and assessed damages against Sandoz at $17,500.

The parties filed several posttrial motions. Sandoz filed a motion seeking judgment *n.o.v.* on the strict liability count. The trial court granted Sandoz's motion and entered judgment *n.o.v.* Plaintiffs filed a motion seeking a new trial as to damages against Cassida, but the court denied plaintiffs' motion. Plaintiffs, Cassida, and Sandoz are the only parties to this appeal. On appeal, plaintiffs contend the trial court erred in (1) entering a judgment *n.o.v.* for defendant Sandoz, and (2) denying plaintiffs' motion for a new trial on damages as to defendant Cassida.

Plaintiffs first argue the trial court erred in entering judgment *n.o.v.* for defendant Sandoz on the strict liability count. In granting Sandoz's motion for judgment *n.o.v.*, the trial court explained that plaintiffs presented no evidence showing where the dicamba, which allegedly caused their crop damage, came from. The trial court also commented on plaintiffs' witnesses' opinions:

> "You look at the scientific evidence of the defense versus that for the plaintiff, we apply *Pedrick* to that. Opinion witnesses are entitled to express an opinion; it then becomes the weight to be given to that opinion. And any weight given in this case to Mr. Bateman's opinion on those issues I think violates *Pedrick*. It's just not credible. He did not testify as to source ***."

Plaintiffs contend judgment *n.o.v.* was inappropriate because (1) the trial court incorrectly based its decision on the credibility of opinion witness Bateman, and (2) plaintiffs were not required to prove the source of the dicamba damage.

■ A judgment *n.o.v.*, like a directed verdict, is properly entered in those limited cases where "all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand."

*Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14 (1967). A new trial may be granted if a verdict is against the manifest weight of the evidence, but that is not true of a judgment *n.o.v.* A more nearly conclusive evidentiary situation ought to be required before a judgment *n.o.v.* is entered than is necessary to justify a new trial. *Mizowek v. De Franco*, 64 Ill. 2d 303, 310, 356 N.E.2d 32, 35-36 (1976). Judgment *n.o.v.* should not be entered if there is any evidence, together with reasonable inferences to be drawn therefrom, demonstrating a substantial factual dispute, or when the assessment of credibility of the witnesses or the determination regarding conflicting evidence is decisive to the outcome. *Maple v. Gustafson*, 151 Ill. 2d 445, 454, 603 N.E.2d 508, 512 (1992).

■ The trial court has a special responsibility as to expert witnesses. The decision whether to admit expert testimony, both whether the expert is qualified and whether his testimony will assist the trier of fact in understanding the evidence, rests within the sound discretion of the trial court. *People v. Thompkins*, 181 Ill. 2d 1, 6-8, 690 N.E.2d 984, 987-88 (1998); *Swanigan v. Smith*, 294 Ill. App. 3d 263, 273-74, 689 N.E.2d 637, 644 (1998); *Grant v. Petroff*, 291 Ill. App. 3d 795, 801, 684 N.E.2d 1020, 1024-25 (1997).

An expert opinion is only as valid as the reasons for the opinion. *Aguilera v. Mount Sinai Hospital Medical Center*, 293 Ill. App. 3d 967, 974, 691 N.E.2d 1, 6 (1998). When an expert testifies simply that plaintiff should win but is unable to support that conclusion with reasoned analysis, the expert's testimony is worthless, provides no assistance to the jury, and should be stricken. In *Aguilera*, plaintiff's experts testified that the negligent delay in administering a computerized tomography (CT) scan lessened the effectiveness of treatment, neurosurgery, but they admitted that neurosurgery was a decision for the neurosurgeons, and the only neurosurgeons who testified stated that surgery would not have been ordered because the bleeding was so deep inside the brain. *Aguilera*, 293 Ill. App. 3d at 974-75, 691 N.E.2d at 6. Accordingly, the trial court entered a judgment *n.o.v.* for the defendant, which was affirmed by the appellate court.

■ In this case the only evidence that plaintiffs' crops suffered dicamba damage, or that the spraying done by Cassida or by Fish and Hudson could have reached plaintiffs' crops, was provided by plaintiffs' expert, Bateman. Bateman, however, was unable to support those opinions by any reasoning other than his 20 to 30 years' experience. Bateman only provided unsupported, conclusory opinions. As a result, we affirm the trial court's grant of judgment *n.o.v.* in favor of defendant Sandoz.

Plaintiffs' second contention on appeal is that the trial court

abused its discretion in denying their posttrial motion for a new trial on damages as to defendant Cassida. Plaintiffs argue the jury's finding of liability against Cassida included, by definition, a finding of damages. Plaintiffs contend that finding Cassida liable but awarding zero damages is a legally inconsistent verdict, requiring a new trial on damages.

During its deliberations, the jury posed the following questions to the court:

> "If we find someone negligent, do we have to have him pay a monetary amount? ____
>
> If so, what is the minimum amount? ____
>
> and
>
> What is the max amount? ____."

After proceedings were held in chambers, all counsel agreed the questions should be answered as follows:

> " 'If we find someone negligent, do we have to have him pay a monetary amount?' No.
>
> * * *
>
> You should consult the instructions, because your questions are answered in those instructions."

The jury then returned its verdict finding for plaintiffs and against Cassida, but awarding zero damages.

The trial court denied plaintiffs' posttrial motion requesting a new trial as to damages. In denying the motion, the trial court hypothesized that the jury found Cassida negligent because he had sprayed the Banvel when the wind was in excess of the recommended amount, but that the jury did not find evidence of either proximate cause or damage to plaintiffs' crops from Cassida's spraying.

■ If the trial court, in its discretion, finds the jury's verdict is against the manifest weight of the evidence, then it should grant a new trial. However, when there is sufficient evidence to support the jury's verdict, it would be an abuse of discretion for the trial court to grant a motion for new trial. *Gaines v. Townsend*, 244 Ill. App. 3d 569, 575-76, 613 N.E.2d 796, 801 (1993). A new trial should be ordered when the damages awarded are manifestly inadequate, it is clear proved elements of damages have been ignored, or the amount awarded bears no reasonable relationship to the loss suffered by the plaintiff. *Tindell v. McCurley*, 272 Ill. App. 3d 826, 830, 651 N.E.2d 713, 716 (1995). A reviewing court will not reverse a trial court's ruling on a motion for new trial unless the trial court abused its discretion. *Tedeschi v. Burlington Northern R.R. Co.*, 282 Ill. App. 3d 445, 448, 668 N.E.2d 138, 140 (1996).

■ A court should exercise all reasonable presumptions in favor of

a jury's verdict, and the verdict is not "legally inconsistent" unless it is absolutely irreconcilable. A verdict is not irreconcilably inconsistent if any reasonable hypothesis supports the verdict. *Tedeschi*, 282 Ill. App. 3d at 448-49, 668 N.E.2d at 140.

■ The trial court did not abuse its discretion in denying plaintiffs' motion for new trial on damages. Plaintiffs would have us assume the only possible interpretation of the jury's verdict was that the jury found plaintiffs had proved each element of their negligence claim, duty, breach of duty, causation, and damages, but the jury mistakenly failed to award damages. The more logical conclusion is that the jury found Cassida had breached his duty to plaintiffs by spraying the Banvel when the wind was in excess of five miles per hour as prescribed on the label, but either that Cassida's negligent spraying was not a proximate cause of plaintiff's injury or plaintiffs did not sustain damage as a result of Cassida's negligence. In this case, the jury found for Cassida, but simply used the wrong verdict form.

■ Common sense prevails over legalistic reasoning when interpreting the effect of a jury's finding. *Kimmel v. Hefner*, 36 Ill. App. 2d 137, 141-42, 183 N.E.2d 13, 15 (1962). Plaintiffs' argument that the jury's verdict conclusively established Cassida's liability is a "technical and unrealistic position." D. Wilson, *The Motion for New Trial Based on Inadequacy of Damages Awarded*, 39 Neb. L. Rev. 694, 703 (1960) (hereinafter Wilson). The jury's error here was one of form, not substance. A zero damages or nominal damages verdict may be regarded as a "perversely-expressed finding for the defendant," where the jury's mistake is one of not expressing its verdict in the appropriate form, rather than from "any doubt that defendant was not liable." Wilson, 39 Neb. L. Rev. at 701-02. The jury obviously understood how to award and calculate damages—it assessed damages against every other defendant. It is incomprehensible why a jury would find Cassida liable (that plaintiffs had proved each element of the negligence claim), but award zero damages if, in fact, damages clearly existed. The jury's intent to award zero damages was crystal clear, and it was specifically within the province of the jury to find in Cassida's favor. *Long v. Illinois Power Co.*, 187 Ill. App. 3d 614, 626, 543 N.E.2d 525, 533 (1989) (a jury's verdict should be examined to ascertain the jury's intention and in the event the verdict is otherwise supportable, then the verdict is to be molded into form and made to serve unless the reviewing court has doubts as to the verdict's meaning).

The jury's verdict was not against the manifest weight of the evidence. There was sufficient evidence for the jury to reasonably infer that Cassida's negligent spraying was not a proximate cause of plaintiffs' injury. There was testimony that spray drift containing di-

camba could not travel one mile and cause damage to broadleaf plants. The evidence also showed that if any harm resulted at all, it may not have been caused by Cassida's spraying. There was also sufficient evidence from which it reasonably could be inferred that plaintiffs did not sustain damage as a result of Cassida's negligence. Plaintiffs testified their crops were recovering between the Cassida spraying and the Fish and Hudson spraying. And Dr. Fulling testified that, even had dicamba reached plaintiffs' crops from Cassida's spraying, it would not have resulted in a loss of yield.

We also emphasize that the jury specifically asked whether it had to award monetary damages if it found a party negligent. By agreement of all the parties, *including plaintiffs' counsel*, the court replied the jury could find negligence and not award damages. The jury exercised its discretion in finding for defendant Cassida, albeit in the wrong form, and we decline to allow the plaintiffs a second chance.

We affirm the judgment *n.o.v.* in favor of defendant Sandoz on count VI and also affirm the trial court's denial of plaintiff's motion for new trial on damages as to defendant Cassida.

Affirmed.

GREEN and McCULLOUGH, JJ., concur.