2015 IL App (1st) 133373
Opinion filed April 30, 2015

FOURTH DIVISION

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| SALVATORE CIMINO, as Special Administrator of the Estate of Concetta Cimino, Deceased, | ) ) ) | Appeal from the Circuit Court of Cook County, Illinois, |
| Plaintiff-Appellee, | ) ) | County Department, Law Division. |
| v. | ) ) | No. 09 L 11500 |
| GERARD SUBLETTE, M.D., | ) ) ) | The Honorable Thomas L. Hogan, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court, with opinion.
Justices Howse and Ellis concurred in the judgment and opinion.

**OPINION**

¶ 1     This is a medical malpractice wrongful death case that was tried to a jury verdict. The jury ruled in favor of the plaintiff, Salvatore Cimino (hereinafter Salvatore), as special administrator of the estate of Concetta Cimino, deceased (hereinafter Concetta), finding that the defendant, Dr. Gerard Sublette (hereinafter Dr. Sublette), was negligent in the treatment of Concetta and that his negligence was the cause of her death. In its verdict form, however, the jury nevertheless entered "$0.00" as the amount of damages awarded. The plaintiff moved for a new trial on damages alone, and the trial judge granted his motion in part, allowing a new trial on all of the issues. The defendant now appeals, contending that the trial court abused its discretion when it

ordered a new trial because the jury's verdict of no damages was consistent with a finding of liability. The defendant asks that we reinstate the jury's original verdict of liability with zero damages. For the reasons that follow, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3      At the outset, we note that we are baffled by the meager state of the record that is before us. In reviewing this case we have had the benefit only of these documents: (1) the transcript of the jury trial up through the reading of the jury instructions but not including the entry of the verdict in open court; (2) the parties' posttrial pleadings and transcripts of those posttrial proceedings[1]; and (3) a set of jury instructions and verdict forms.[2] What is more, although this is a complex medical malpractice wrongful death case, wherein the parties contest whether the jury found proximate cause between the physician's breach of the standard of care and the decedent's injuries or erred in awarding the appropriate damages, neither party has attempted to address, even minimally, what transpired at trial. Our courts have long held that a reviewing court is "not a repository into which an appellant may foist the burden of argument and research." (Internal quotation marks omitted.) *Velocity Investments, LLC v. Alston*, 397 Ill. App. 3d 296, 297 (2010). Supreme Court Rule 341(h)(6) and (h)(7) requires a statement of the facts, with citation to the record, necessary for an understanding of the case and a clear statement of contentions with

_____

[1] These documents were provided to this court only after on our own motion, we ordered the parties to supplement the record with all of the transcripts and documents relating to the posttrial proceedings.

[2] The record initially contained only a copy of an unsigned jury verdict form. The signed copy, including the jury's award of damages, was obtained by this court, only after on our own motion, we requested that the parties supplement the record with, *inter alia*, a copy of that document.

supporting citation of authorities and pages of the record relied on. Ill. S. Ct. R. 341(h)(6), (7) (eff. July 1, 2008). It is not the reviewing court's job to "sift through the record or complete legal research to find support for *** issue[s]." *In re Marriage of Kiferbaum*, 2014 IL App (1st) 130736, ¶ 21. That said these are the facts that we have been able to glean from the limited record that has been placed before us.

¶ 4       A three-day trial took place between April 8, and April 11, 2013, at which the following evidence was adduced.

¶ 5                                    A. Roseann Branken

¶ 6       The plaintiff first called Roseann Branken (hereinafter Roseann), the daughter of the deceased, Concetta. She testified that in January 2009, her mother was 83 years old and retired, living alone in Franklin Park. Roseann averred that Concetta was "pretty active" for an 83-year-old woman and that she belonged to a church community center, went to church, played Bingo, and "liked to be festive" and to gather family at her home. Concetta did not drive by herself and needed family members to drive her around. Roseann, who lived only 15 minutes away from Concetta, visited Concetta every day and drove her to many of her daily activities.

¶ 7       According to Roseann, prior to January 2009, Concetta was also "in pretty good health for a woman of her age." Concetta had some arthritis in her shoulders and back, and she took blood pressure medication and water pills. Seven years earlier she had had two artificial knee replacement surgeries. Other than these, however, Roseann averred that Concetta was in good health. Roseann was familiar with Concetta's physicians because she drove her mother to those visits. She stated that Concetta had been seeing only two doctors: (1) Dr. Charles Mattis (hereinafter Dr. Mattis), her general practitioner; and (2) Dr. Bajgrowicz, her cardiologist at

Gottlieb Memorial Hospital, whom she saw only once or twice a year for routine cardiac checkups.

¶ 8    Roseann next testified regarding the events leading up to Concetta's death. She stated that on Saturday, January 9, 2009, Concetta telephoned her to say that she had been vomiting and was not feeling well and to ask Roseann if she could come by. Roseann went to Concetta's house at about 7 p.m., a couple of hours after receiving that call. According to Roseann, Concetta looked tired, but was still able to walk. Concetta went to lie down and rest and Roseann made her some tea. In the next couple of hours, Concetta continued to get out of bed to go to the bathroom to vomit. Initially, neither of them was nervous or worried, and Concetta told Roseann that it must be the "flu bug" that was "going around." However, at about 2 a.m., after Concetta continued to throw up, she asked Roseann to take her to the emergency room.

¶ 9    Concetta was transported by ambulance to Gottlieb Memorial Hospital. Roseann stayed with Concetta in the emergency room (hereinafter the ER) until the staff took her blood tests. At that point, at Concetta's insistence, Roseann returned home to rest. Roseann returned to the hospital at about 9 a.m., the next morning, telephoning her brother, the plaintiff, Salvatore Cimino (hereinafter Salvatore) on the way to tell him that their mother was in the ER.

¶ 10   At this point, Concetta had been moved from the ER to a regular room. At about 10 or 11 a.m., Roseann spoke to Dr. Mattis, Concetta's general practitioner, who informed her that whatever "Concetta had could be serious and she could need surgery." Dr. Mattis told Roseann that the CT scan that was performed on Concetta was "not diagnostic" (*i.e.*, was inconclusive) and that the physicians would probably have to do a colonoscopy to see what was going on. He also told Roseann that "there may be blockage" so that Concetta may have to undergo surgery. After speaking with Dr. Mattis, Roseann went to see her mother. Concetta looked tired, but was

4

her usual talkative self. Dr. Mattis had already spoken to her about what was going on, and she was aware about the possible colonoscopy. According to Roseann, Concetta was lucid, alert and capable of making competent medical decisions. Concetta received numerous family visitors that day in the hospital, and Roseann stayed with her until very late that night.

¶ 11 After going home to sleep, Roseann returned to the hospital at about 8 a.m. on January 12, 2009. Once there, she was informed that Concetta was being taken in for a chemical stress test, which would be followed by a colonoscopy. A nurse presented Roseann with several consent forms (for a colonoscopy, polypectomy, biopsy and gastroscopy) and she signed them. Roseann stated that she never met or spoke with the defendant, Dr. Sublette, prior to or after he performed the colonoscopy. Instead, Roseann spoke only to the nurse who "vaguely" described the colonoscopy procedure for her. Roseann explained, however, that she was generally aware of what a colonoscopy entailed because she had undergone the procedure herself in the past. Roseann also averred that no one at the hospital warned her of the risk of diverticulitis or a risk of perforation if there was diverticulitis, during a colonoscopy. She stated that it was her impression that Concetta was undergoing a purely routine test.

¶ 12 Roseann next testified that while Concetta underwent the colonoscopy, together with her niece, Lora Cimino, she waited in the hospital waiting room, right across from the procedure room. Roseann had been told that the procedure would last about 20 minutes to half an hour. However, about 10 minutes into the procedure a nurse came out of the room and informed her that there had been complications because Concetta had thrown up during the colonoscopy. The nurse explained that they immediately had to stop the colonoscopy and put a tube down Concetta's throat to help her breathe. The nurse also told Roseann that they were prepping Concetta for an emergency surgery.

¶ 13    Soon thereafter, Roseann watched as Concetta was moved from the colonoscopy procedure room to the operating room. She testified that in those few minutes, Concetta's eyes were open, but that she could not speak because she was intubated. Immediately after that, Roseann telephoned her brother.

¶ 14    Roseann stated that during the surgery, the operating physician, Dr. Raul Villasuso (hereinafter Dr. Villasuso), came out of the operating room to explain to her that he need to "resection Concetta's colon." He told Roseann that he "had a lot of poison to clean out and that he was going to give it his best shot" so that Concetta "would come out of it." After the surgery, Concetta was placed in the intensive care unit (ICU). She remained intubated and was unable to speak. She died in the hospital two days later, on Wednesday, January 14, 2009.

¶ 15    Roseann next testified that Concetta's hospital bills and funeral expenses have been paid. She further testified that since Concetta's death the family has not been the same. She explained that Concetta was very good at gathering the family, but that, since her passing, the members have "each gone their own way" and "do not even celebrate major holidays together."

¶ 16    On cross-examination, Roseann stated that she never heard Concetta complaining about abdominal pain while in the ER and that she would have complained if she had been experiencing pain.

¶ 17                            B. Salvatore Cimino

¶ 18    Concetta's son, Salvatore Cimino (hereinafter Salvatore) next testified consistently with Roseann's testimony. He stated that for a woman her age, Concetta was in "pretty good health" and active with her friends, neighbors and family. He acknowledged that Dr. Mattis was initially his physician and that he referred his mother to him.

¶ 19    Salvatore testified that at about 9 a.m. on Sunday morning, Roseann telephoned him to say

that she had taken Concetta to the hospital for vomiting. According to Salvatore, there was no urgency in Roseann's voice. Salvatore stopped by the hospital at around 11 or 12 p.m. that day. He did not speak to any physicians but only went to see his mother. Salvatore testified that Concetta looked tired but was not complaining of any pain.

¶ 20    Salvatore stated that he returned to the hospital on the afternoon of Monday, January 12, 2009, after receiving a telephone call from Roseann, informing him that something had gone wrong during the colonoscopy and that they were taking Concetta to surgery. Once at the hospital, Salvatore learned from Roseann that "Concetta's colon had burst." After the surgery, Concetta was placed in the ICU, where she remained in a coma. Salvatore testified that had the family known that there could be complications during the colonoscopy, they would never have taken the risk and subjected Concetta to the procedure.

¶ 21    Salvatore acknowledged that Concetta did not provide any financial support to the family. Nevertheless, he explained that Concetta's death has impacted the family tremendously. He explained that Concetta was the family matriarch who kept everyone together and provided everyone with emotional support. Since her death, the family has not remained close and they do not see each other as often as they did in the past. Salvatore, however, acknowledged that family relations have changed not because of the manner in which Concetta died, but only as a result of her passing away.

¶ 22    Salvatore also testified that all the hospital bills and funeral expenses have been paid.

¶ 23                                    C. Lora Cimino

¶ 24    Concetta's granddaughter, and Salvatore's daughter, Lora Cimino (hereinafter Lora), next testified consistent with the testimonies of Salvatore and Roseann that Concetta was a "very active woman."

¶ 25     Lora stated that she last saw Concetta healthy on the morning of Saturday, January 10, 2009, when she went to her grandmother's house together with her father Salvatore to have breakfast. Lora averred that Concetta made breakfast for everyone and at that time she seemed well and did not appear to be in any pain.

¶ 26     Lora testified that she next saw Concetta at the hospital on Sunday January 11, 2009. Concetta looked tired but was talking and getting up out of bed to walk around the room and talk to different family members who came to visit her that day. According to Lora, the atmosphere was lighthearted and there was no sense of urgency.

¶ 27     Lora stated that she next saw Concetta when the nurse wheeled her out of the colonoscopy procedure room to take her to emergency surgery. According to Lora, Concetta was awake but could not speak because she had a tube down her throat for breathing. The nurse explained to Lora that they had put the tube down Concetta's throat because she had vomited during the colonoscopy and some of that vomit had gone into her throat, so she needed the tube to breath.

¶ 28     Lora also testified that she was in the ICU room together with Roseann a couple of days later when Concetta died. She stated that since then the family has not been the same and that they do not get together as often as they did in the past.

¶ 29                              D.  Dr. Sublette

¶ 30     The plaintiff next called, defendant, Dr. Sublette, as an adverse witness pursuant to section 2-1102 of the Illinois Code of Civil Procedure (Code) (735 ILCS 5/2-1102 (West 2012)). Dr. Sublette first testified that he is a board-certified physician in internal medicine and gastroenterology (*i.e.,* the study of the diseases of the digestive system and liver). Dr. Sublette stated that in 1978 he completed his undergraduate studies at Michigan State University and that he obtained his medical degree in 1981 from the University of Illinois Medical School in

Chicago. Between 1978 and 1981, Dr. Sublette completed his residency in internal medicine at Lutheran General Hospital. Subsequently, he pursued a fellowship in gastroenterology at Hines Veterans' Hospital in Chicago. In 1984, he joined the staff of Gottlieb Memorial Hospital and remains on that staff today. Dr. Sublette stated that he is currently also part of the staff at Elmhurst Hospital, Westlake Hospital and Good Samaritan Hospital, as well as a member of a private practice called Associates in Digestive Disease in Elmhurst.

¶ 31    Dr. Sublette next testified that as part of his practice he sees about 100 patients a month and regularly performs colonoscopies. He explained that a colonoscopy includes using a scope with a light to visualize the area of the lumen in the colon. According to Dr. Sublette, the tube is inserted through the rectum and guided up through the colon, both by moving the tube and the colon itself. Dr. Sublette acknowledged that in order to perform a colonoscopy it is preferable that the colon be emptied prior to the procedure.

¶ 32    Dr. Sublette next averred that on January 10, 2009, Dr. Mattis requested that he consult as a gastroenterologist in Concetta's case at Gottlieb Memorial Hospital. Dr. Sublette stated that he has no independent recollection of that consultation but that for purposes of his testimony he reviewed all the documents on record in Concetta's case. Dr. Sublette averred that it is general practice to review a patient's medical chart before doing the consult but that he could not recall whether he actually did so in this case. He stated, however, that he would have been familiar with all the information in Concetta's chart either by reviewing the chart itself or by speaking with other physicians prior to the consult.

¶ 33    Dr. Sublette first acknowledged that Concetta's chart included an X-ray report written by the radiologist, Dr. Peter Zuehlke (hereinafter Dr. Zuehlke), analyzing Concetta's X-rays taken in the ER on January 11, 2009. Under the rubric "indication" that X-ray report stated that Concetta had

9

"abdominal pain, rule out obstruction, nausea and vomiting." In the conclusion section, the document also stated that there was a large amount of stool in Concetta's distended colon but not so much in the rectum. The report further stated that as a result of the stool it was impossible "to exclude a partial lower gastrointestinal obstruction versus constipation/fecal impaction." Dr. Sublette acknowledged that the document nowhere mentioned "a mass" or "tumor" or "lesion."

¶ 34       Dr. Sublette next testified regarding Concetta's CT scan that was ordered by the ER, and was also part of Concetta's medical report. Dr. Sublette acknowledged that the CT scan report stated that there were numerous diverticula noted in the colon and that "an underlying partially obstructed colon mass or early changes of acute diverticulitis" could not be excluded. Dr. Sublette admitted that the colon mass could have been just fecal material, but insisted that it also could have been something else.

¶ 35       With respect to the numerous diverticula noted in the colon, Dr. Sublette explained that a diverticulum (plural diverticula) is an outpunching on the colon—a weakness in the wall that "looks like a balloon on the side of a tire," which is common in older people. He acknowledged that a patient that has more than one diverticula has a condition known as diverticulosis. Dr. Sublette admitted that in theory having diverticulosis presents a danger for the patient because the diverticulum could become infected with bacteria (*i.e.*, the patient could develop a condition known as diverticulitis). He, stated, however, that usually a person can live with diverticulosis without any problems and without requiring any treatment or additional examinations. According to Dr. Sublette, if you have diverticulosis, there is about a 10 % chance over your lifetime that you would get diverticulitis (an infection) or bleeding from the diverticulum.

¶ 36       Dr. Sublette further testified that the CT scan report also revealed that Concetta had: (1)

dilated bile ducts, which could have been caused by a duct stone; and (2) coronary artery calcification, which would indicate coronary artery problems. He admitted that patients with coronary artery disease may have a greater risk of cardiac problems occurring during a colonoscopy.

¶ 37    Dr. Sublette next testified regarding Dr. Mattis's notes, which were also part of Concetta's medical chart and which, Dr. Sublette averred, he would have reviewed prior to his consult. In that report, Dr. Mattis wrote that Dr. Zuehlke, the radiologist, noted that although Concetta had a ventral hernia, there was concern "about the possibility of there being colon pathology which might include the possibilities of diverticulitis or even tumor." Dr. Mattis wrote in his notes that "in light of the patient's elevated white blood cell count, [he would] begin [treatment with] broad spectrum antibiotics," to reduce the diverticulitis or infection. Dr. Sublette agreed that Dr. Mattis' decision to treat "for inflammation" was a sound course of treatment, but explained that Dr. Mattis was treating "rather nonspecifically" for inflammation because of the elevated blood cell count.

¶ 38    Dr. Sublette further testified that Dr. Mattis's final differential diagnosis (one where the doctor lists all the possible diagnoses) included: (1) abdominal pain and coffee ground emesis (which is the description of brown vomit that looks like coffee grounds, revealing that the patient is vomiting blood); (2) a possible partial bowel obstruction; (3) possible diverticulitis; and (4) a possible mass or lesion.

¶ 39    Dr. Sublette was asked whether within a reasonable degree of medical certainty it was his opinion that the most likely diagnosis with a patient with Concetta's medical record (namely, the numerous diverticula in her colon and the elevated white blood cell count), was that the patient was suffering from diverticulitis. Dr. Sublette answered in the negative, stating that in this

particular case the information that the doctors had was confusing and that in his opinion she could have had one of four things: (1) cancer; (2) diverticulitis; (3) a common duct stone; or (4) an incarcerated small bowel from a hernia. Accordingly, he stated that there was only a 25% chance that she was suffering from diverticulitis.

¶ 40     Dr. Sublette next testified regarding the results of the gastrografin (the lower gastrointestinal examination) performed on Concetta prior to the colonoscopy and also part of her medical chart. Again, as with the previous documents, the doctor could not recall whether he actually read the written report or if he obtained the information by speaking to one of his colleagues. Dr. Sublette next acknowledged that the results of that examination reveled that there was a partial lower gastrointestinal obstruction in two locations. According to the report, the first of those obstructions was a significant narrowing of a middle section of the colon that was "circumferential" and "could represent a carcinoma," although a tumor or mass was undetected. The second was a long segment of narrowing in the sigmoid colon (closest to the rectum) with evidence of "diverticulosis and muscular hyperotrophy, with no signs of perforation, fistula tract or filling of an abscess cavity."

¶ 41     Dr. Sublette next testified to the contents of his own notes completed after his consult with Concetta. He acknowledged that he noted that Concetta was an 83-year-old female with abdominal pain which was diffuse (*i.e.*, not centered in one area but, rather, all over her abdomen), with a high white blood cell count, on antibiotics, and under laboratory and diagnostic findings. He further noted that the patient may have had an incarcerated umbilical hernia in the lower area (which would mean that the bowel was trapped) or a hernia itself. Dr. Sublette's notes further stated that it is likely that the perforation in the colon "is probabl[y] from

diverticular disease." Dr. Sublette explained that by this note he meant that diverticulosis was causing the narrowing of the colon, and not that he was certain that she had diverticulitis.

¶ 42    Dr. Sublette next admitted that he had the power to order or prevent the colonoscopy from going forward at any point, but that he chose to proceed with the procedure. He acknowledged that in the face of "acute diverticulitis, if you know the diagnosis," it is better not to proceed with the colonoscopy, and that the standard of care for gastroenterologists advises against performing the procedure. He acknowledged that the reason for this is that with diverticulitis the wall of the colon is weaker and there may already be existing perforations, so that with colonoscopy, there is a greater risk of perforating the colon during the procedure. In addition, Dr. Sublette admitted that according to the proper standard of care for the treatment of a person with suspected "acute diverticulitis," the patient should be given antibiotics and then time should be allowed for the antibiotic therapy to work to determine if the white blood cell count will go down and the infection can be treated. Dr. Sublette averred, however, that in this particular situation, he did not have the diagnosis of "acute diverticulitis" but, rather, that there was only a one in four chance that Concetta suffered from this condition.

¶ 43    Using his notes, Dr. Sublette next testified regarding the colonoscopy procedure itself. He stated that the colonoscopy itself revealed that the patient had a poorly prepped colon and that there was still a lot of stool inside. After going from the rectum to the cecum, which is generally as far as you go for a standard colonoscopy,[3] Dr. Sublette discovered no obstruction or mass or

---

[3] On cross-examination, however, Dr. Sublette testified that this portion of his notes was incorrect and that during the procedure he in fact never made it all the way up to the cecum; rather, during the procedure he was able to get only midway up to the colon before Concetta began to vomit.

tumor in the colon. He did however find "myriads of diverticula." Dr. Sublette acknowledged that at this point in the procedure, Concetta began to vomit, and the vomit was feculent (*i.e.*, it smelled and looked a lot like stool). Accordingly, Dr. Sublette immediately stopped the procedure and rushed Concetta to emergency surgery. Dr. Sublette acknowledged that after the emergency surgery was performed, he learned from the surgeon, Dr. Villasuso that the colon had perforated after the colonoscopy. He also acknowledged that Dr. Villasuso's report noted as the pathological diagnosis: "acute diverticulitis with perforation and perricolonic abscess (collection of puss) formation."

¶ 44     Dr. Sublette admitted that Concetta died of sepsis because of the perforation of the bowel. He averred, however, that he thinks that the perforation occurred a little while before the colonoscopy, but that "there is no way to know that." He admitted that he was aware prior to performing the procedure that Concetta's white blood count cell had increased between Sunday and Monday when the colonoscopy was performed, but that despite those results, no one chose to perform a follow-up X-ray or CT scan to confirm whether or not there was a perforation. Dr. Sublette also admitted that an oncologist was never consulted prior to the colonoscopy even though there had been a fear of a mass or tumor. He, however, denied that it would have been standard, or even advisable, procedure to consult such a specialist prior to the colonoscopy. Dr. Sublette explained that the physicians did not know whether they were dealing with cancer, but merely suspected it, so that proper procedure would have been to perform the colonoscopy and only if that revealed cancer consult an oncologist.

¶ 45     On cross-examination, Dr. Sublette testified that nothing in Concetta's medical records that he reviewed prior to the colonoscopy led him, or should have led him, to believe that she was suffering from acute diverticulitis. He explained that none of the following signs of acute

diverticulitis were present either in Concetta's chart or obvious after his exam: (1) pain in the lower left quadrant of the abdomen; (2) tenderness of that left quadrant; (3) a CT scan showing an inflammation about the bowel (including significant stranding and edema in the mesentery of the colon), free air (*i.e.*, a big hole and air and stool getting into the peritorium) abscesses, or a fistula (*i.e.*, an abnormal connection between the colon and another organ); and (4) fever.

¶ 46      On cross-examination, Dr. Sublette also testified that a high white blood cell count does not necessarily mean infection, but rather only inflammation. He stated that it is possible to have abdominal pain and a high white blood cell count and still not have diverticulitis. Other possibilities for those same symptoms include, among other things: appendicitis, acute cholecystitis, common duct stone, ischemic bowel (lack of blood going to the bowel), colitis, small bowel obstruction, cancer, and lupus. According to Dr. Sublette, most of these diagnoses can be ruled out through a colonoscopy.

¶ 47      Dr. Sublette testified that he performed the colonoscopy in order to rule out or diagnose cancer or an obstruction from cancer. He stated that based upon his background, training, experience and everything he knew about the patient, he believed that it was unlikely that she had diverticulitis and that it was reasonable to go ahead with the colonoscopy. In addition, Dr. Sublette averred that prior to the procedure he discussed with Concetta all the potential risks and benefits of the colonoscopy and that she chose to proceed with the procedure.

¶ 48                          E. Dr. Marshall Sparberg

¶ 49      Dr. Marshall Sparberg (hereinafter Dr. Sparberg), the plaintiff's expert gastroenterologist next testified, *inter alia*, that for purposes of this trial, he reviewed Concetta's medical records available to Dr. Sublette prior to the colonoscopy and that it was his medical opinion that Dr.

Sublette's choice to perform the colonoscopy on January 12, 2009, was a deviation from the standard of care that proximately resulted in Concetta's death.

¶ 50      Dr. Sparberg explained that after having reviewed the medical charts available to Dr. Sublette, it was his opinion that this was "a fairly typical presentation of acute diverticulitis in an elderly woman."  He disagreed with Dr. Sublette's testimony that there was only about a 25% chance that Concetta suffered from diverticulitis and averred that, based on the presence of inflammation and the acute onset of Concetta's symptoms, it was a 90% to 95% chance the diagnosis was diverticulitis.

¶ 51      Dr. Sparberg stated, however, that even if the treating physicians suspected a possible partially obstructed mass or tumor, the proper course of treatment in a patient like Concetta, who was 83 years old and had a very high white blood cell count (establishing acute inflammation), would have been to wait at least a month before performing a colonoscopy to permit the antibiotics to reduce the inflammation.  Dr. Sparberg testified that after the inflammation was reduced it would have been easier to diagnose any potential mass or tumor because "a CT scan is a much better diagnostic tool than colonoscopy," since with a colonoscopy it is possible only to view the lining of the bowel, whereas with a CT scan one can view the surrounding areas as well.

¶ 52      Dr. Sparberg testified that after reviewing the treating physicians' notes it was his understanding that the reason for such a quickly attempted colonoscopy was that the general surgeon, Dr. Villasuso, wanted information about whether Concetta had cancer or just diverticulitis, and the only way to make such a diagnosis was to "take a look and biopsy." According to Dr. Sparberg, this reasoning was flawed.

¶ 53      On cross-examination, however, Dr. Sparberg admitted that Concetta had "a less than typical

presentation of acute diverticulitis" because patients with acute diverticulitis generally do not exhibit diffuse abdominal pain, diarrhea, and vomiting.

¶ 54                    F.  Proffer of Medical and Funeral Expenses

¶ 55      After Dr. Sparberg's testimony, the plaintiff's attorney read into evidence several items.  The parties had agreed in advance that this evidence would not be referred to as a "stipulation," so as to avoid any confusion by the jury.  Rather, after each reading by plaintiff's counsel, the court asked the defense whether the defense had any objection to the introduction of the testimony and the defense responded in the negative.  The plaintiff first introduced the actuarial life tables of the Office of the Chief Actuary of the United States Social Security Administration, stating that the average life expectancy of a 59-year-old man, such as Salvatore, is 21.69 more years of life, that the average life expectancy of a 62-year-old woman, such as Roseann, is 22 more years of life, and that the average life expectancy of an 83-year-old woman, like Concetta, is 7.77 years of life.  The plaintiff further read into the record that the medial expenses related to Concetta's treatment from the time of the colonoscopy until her passing away totaled $20,853.35 and that the funeral expenses were $10,500.

¶ 56                                 G.  Dr. Charles Mattis

¶ 57      After the plaintiff rested its case-in-chief, the defendant first presented the videotaped evidence deposition of Dr. Richard Charles Mattis.  Dr. Mattis, Concetta's treating physician, stated that he obtained his medical degree from Loyola University Medical School in 1971 and completed an internship and residency in internal medicine at Rush Presbyterian-St. Luke's Hospital in Chicago in 1974.  He acknowledged that he has been Concetta's primary treating physician since 1996.

¶ 58      Dr. Mattis next testified regarding the events of January 2009.  He stated that he first saw and

examined Concetta at 8:50 a.m., on January 11, 2009, in the emergency room of Gottlieb Memorial Hospital. At that time, Concetta complained of vomiting, diarrhea and abdominal pain. The vomiting was black and looked like coffee grounds. Dr. Mattis discussed Concetta's case with the ER physicians (Dr. Slobodkin and Dr. Viglione). He then made a note of Concetta's prior medical history, including a history of urinary tract infections, cardiac arrhythmias, a cardiac valvular problem, and some arthritic pain. Upon examination, Dr. Mattis observed, *inter alia*, that Concetta's abdomen was distended but soft, and that she had a prominent umbilicus or swollen naval that was tender to the touch (which he believed was from a ventral hernia). Dr. Mattis next noted that Concetta's white blood cell count was very high (18,600, with 12,000 being normal) and that her X-ray and CT scan revealed a bowel obstruction. After reviewing the CT scan, Dr. Mattis believed that the obstruction was compatible with ventral hernia.

¶ 59 Nevertheless, because this was not his area of expertise, Dr. Mattis consulted with Dr. Zuehlke, the radiologist responsible for the X-ray and CT scan. Dr. Zuehlke's impression was that the patient suffered from a ventral hernia but that, in addition, she had additional abnormalities in the sigmoid colon. Dr. Zuehlke mentioned the possibility of diverticulitis or even a tumor in the colon. Accordingly, based on his conversation with Dr. Zuehlke and Concetta's high white blood cell count, Dr. Mattis prescribed antibiotic treatment. At that point, he consulted with the general surgeon, Dr. Villasuso, and the gastroenterologist, the defendant, Dr. Sublette.

¶ 60 Dr. Mattis averred that neither he nor any of the physicians he consulted with ever made a definitive diagnosis for Concetta.

¶ 61 Dr. Mattis further testified that he examined Concetta again on January 12, 2009, prior to her

colonoscopy.  At that time, she still had abdominal pain, her abdomen was distended, and there was discoloration forming at the umbilicus with tenderness to the abdominal wall.  In addition, Concetta's white blood cell count was even more elevated at 25,100, and she had reduced function of her kidneys.

¶ 62    Dr. Mattis acknowledged that he was aware that Dr. Sublette had spoken to Concetta and recommended a colonoscopy.  He testified that he has known Dr. Sublette for a number of years and that he considers him to be a very well-qualified gastroenterologist.  Dr. Mattis also testified that he was aware that Dr. Villasuso had consulted with Concetta and was planning a possible surgical intervention after the colonoscopy. According to Dr. Mattis, the plan of treatment was to make a definite diagnosis as to the cause of Concetta's problem and to perform a surgical correction of what appeared to be a partial small bowel obstruction.  Dr. Mattis testified that it was his medical opinion that this plan of treatment was reasonable.

¶ 63    Dr. Mattis qualified, however, that although he had worked with and trusted both Dr. Sublette and Dr. Villasuso he did not and could not make the decision as to whether a colonoscopy and/or surgery could or should have been performed because that was not his area of expertise.  He could, and did, however, defer to Dr. Sublette's and Dr. Villasuso's judgment.

¶ 64    On cross-examination, Dr. Mattis admitted that Concetta had been diagnosed with a ventral hernia before.  He further admitted that ventral hernias are not life threatening and that they often do not require any treatment or surgical correction.

¶ 65    On cross-examination, Dr. Mattis also admitted that based on Concetta's presentation at the ER it was more probably true than not, within a reasonable degree of medical certainty, that the diagnosis was diverticulitis.  Dr. Mattis explained, however, that there was an additional problem with Concetta's case in that she had an incarcerated ventral hernia that was tender to the touch,

changing color and suggestive of the need for expeditious surgical treatment. He stated that any surgeon who was to perform surgery for such a ventral hernia would want to know whether he simply needed to repair the hernia or if there was indeed another obstructive lesion, possibly cancer, that needed to be addressed.

¶ 66                                    H. Dr. Zuehlke

¶ 67        Radiologist, Dr. Peter David Zuehlke, next testified that in 2009 he interpreted three radiographic studies (an X-ray of the abdomen and chest; a CT of the abdomen and pelvis; and the lower GI with gastrofin) that were ordered by Dr. Slobodkin, the ER physician, treating Concetta at Gottlieb Memorial Hospital. After reviewing the results of those studies, Dr. Zuehlke wrote a report.

¶ 68        Dr. Zuehlke testified that in that report he noted that the X-ray revealed that there was a large amount of stool in the distended colon, but not so much in the rectum. He noted that there was no sign of pneumoperitoneum (*i.e*., air or bowel gas filling the space inside the abdomen where the vital organs sit), which evinced no perforation of the bowel. Accordingly, based on the X-ray, Dr. Zuehlke concluded that he could not exclude "a partial lower GI obstruction versus constipation/fecal impaction."

¶ 69        Dr. Zuehlke further averred that the CT scan revealed that there was "extensive diverticulosis of the descending and sigmoid colon and distention of the proximal colon filled with stool." He further noted a "thickening of the sigmoid colon," which he explained could be evidence of a malignant tumor, or merely a complication of diverticulosis, which could eventually lead to diverticulitis. He further noted minimal pericolonic stranding (generally an indicator of an inflammation), which itself can be caused either by infection (acute diverticulitis) or by cancer. Dr. Zuehlke nevertheless noted that the CT scan showed no evidence of abscesses or

pneumoperitoneum, which would have been clear indicators of diverticulitis. Accordingly, Dr. Zuehlke testified that he could exclude neither diverticulitis nor an underlying partial obstructed colon mass/lesion (*i.e.*, cancer). He therefore "recommended eventua[l] colonoscopy." Dr. Zuehlke, however, stated that because it was not his area of expertise, on such issues, he deferred to the either the gastroenterologist or the surgeon who perform the colonoscopy.

¶ 70       Dr. Zuehlke next testified about his findings related to the lower gastrointestinal (GI) study. He explained that this type of test is useful because it can show fistulas (*i.e*. abnormal pathways from two different organs that are normally not connected), which are indicators of diverticulitis. According to Dr. Zuehlke, Concetta's lower GI study revealed that she had a partial lower GI obstruction in two locations: (1) a narrowing of the mid-descending colon, which could have represented a cancer; or (2) a long segment of narrowing in the sigmoid colon (closest to the rectum) with evidence of diverticulosis, but also a possibility of a second mass (or tumor). The GI study, however, also revealed no additional findings suggestive of acute diverticulitis, including no sign of perforation, fistulas, or filling of an abscess cavity. As such, based on this test, Dr. Zuehlke was unable to rule out either cancer or diverticulitis.

¶ 71       According to Dr. Zuehlke, there were no additional radiographic studies available that could have added to his evaluation and a more definite diagnosis.

¶ 72       On cross-examination, Dr. Zuehlke, *inter alia*, admitted that when analyzing the X-ray in his report, he never wrote "lesion/mass/tumor" in his conclusion section, but merely stated that he could not "exclude a partial lower GI obstruction."

¶ 73       On cross-examination, Dr. Zuehlke also admitted that even if Concetta had a mass or tumor inside her colon, it would most likely have been an adenocarcinoma, which is a slow-growing tumor in an 83-year-old woman.

¶ 74                                  I.  Dr. Raul Villasuso

¶ 75       Dr. Raul Villasuso next testified that he is a specialist in general and vascular surgery.  He

acknowledged that in January 2009 he was involved in the care and treatment of Concetta at

Gottlieb Memorial Hospital.  Dr. Villasuso testified that he was asked to consult on Concetta's

case because she had a swollen and sore abdomen, was complaining of discomfort, and had what

appeared to be an obstructed bowel from a hernia.  According to Dr. Villasuso, the hernia could

have been caused by the obstructed bowel, but also could have been a separate condition.  Dr.

Villasuso explained that in either event an obstructed bowel will ultimately result in death

because either the bowel dies from pressure or it perforates, causing peritonitis.  He therefore

wanted more information to determine whether he needed to perform emergency surgery and

looked to the X-ray and CT scan.

¶ 76       Dr. Villasuso testified that after reviewing Concetta's X-ray and CT scan, he came to the

conclusion that emergency surgery should be avoided.  He explained that after reviewing the X-

ray and CT scan he discovered that the hernia was not causing the bowel obstruction, but that it

was either being caused by a tumor (cancer) or diverticulitis.  Dr. Villasuso believed that because

of the patient's old age and obesity and all of her other comorbidities (*i.e.,* bad heart, bad lungs)

that increased the risk of emergency operation, surgery should be avoided at all cost, before the

source of the problem could be established.  Dr. Villasuso wanted to know: (1) whether, if there

was any inflammation (diverticulitis), that inflammation could be treated medically; (2) whether

there was a tumor or cancer; and (3) if so, whether that tumor could be treated later (as elective

surgery) rather than immediate (emergency) surgery.  He explained that in a patient as old as

Concetta, even if the colonoscopy revealed colon cancer, he would have chosen to avoid surgery.

As a result, Dr. Villasuso first ordered a gastrofin lower GI test.

¶ 77        Dr. Villasuso next testified that unfortunately the results of the GI test did not help in definitively diagnosing Concetta. He therefore requested a colonoscopy be performed as soon as possible, so as to determine what was causing the bowel obstruction. Dr. Villasuso explained that whatever was causing the obstruction (inflammation or a cancerous or benign tumor), if that obstruction went untreated, it would ultimately result in Concetta's death. As such, according to Dr. Villasuso even if Concetta suffered from acute diverticulitis, if the antibiotics did not work, she would most likely have required surgery to remove the bowel obstruction. He explained that under Concetta's condition and symptoms, if colonoscopy had not been attempted, he was planning on taking Concetta to emergency surgery the next day. Dr. Villasuso also believed that the colonoscopy could be therapeutic because it could potentially decompress the bowel, so surgery could be avoided altogether. He stated that if he had thought the procedure would have been dangerous for Concetta, he never would have contacted Dr. Sublette.

¶ 78        Dr. Villasuso further acknowledged that he performed the emergency surgery on Concetta after complications arose during the colonoscopy. That surgery revealed that Concetta had chronic and acute diverticulitis, and a fistula between the large and small bowel, which perforated at some point, "either prior to, during or after the colonoscopy," ultimately causing death. Dr. Villasuso could not pinpoint the exact time the perforation occurred and stated that "there was no way to tell."

¶ 79        On cross-examination, Dr. Villasuso acknowledged that he discussed the choice of gastroenterologist with Dr. Mattis and Dr. Mattis recommended Dr. Sublette. He also acknowledged that he did not have the authority to order Dr. Sublette to perform the colonoscopy and that it was entirely in Dr. Sublette's power to order or refuse to perform the procedure.

¶ 80                                         J. Dr. Michael Goldberg

¶ 81        Dr. Michael Goldberg, the defendant's expert gastroenterologist testified, *inter alia*, that for purposes of this trial, he reviewed Concetta's medical records from Gottlieb Memorial Hospital and from Dr. Mattis's office, as well as the depositions of Salvatore, Lora, Dr. Mattis, Dr. Zuehlke, Dr. Villasuso, Dr. Sublette and Dr. Sparberg. Dr. Goldberg opined that on the basis of these documents, it was his opinion to a reasonable degree of medical certainty that Dr. Sublette complied with the standard of care in choosing to perform the colonoscopy. Dr. Goldberg explained that this was an 83-year-old patient that was "basically going to the operating room," because of the obstruction in her colon, and that it was necessary to determine the exact diagnosis in order to proceed forward with treatment. Dr. Goldberg opined that it was important to rule out a tumor or cancer.

¶ 82                                    K.  Closing Arguments

¶ 83        After the defense rested, the parties proceeded with closing arguments. Counsel for the plaintiff argued that the evidence presented at trial established that Dr. Sublette deviated from the standard of care by performing the colonoscopy on Concetta without first attempting to see if the antibiotics would work and that Concetta died as a direct result of his decision to proceed with the procedure. With respect to damages, counsel for the plaintiff asked the jury to award $1,200,000 in damages to Salvatore and Roseann for the pecuniary loss they suffered as a result of Concetta dying earlier than what the average life expectancy of a person her age would have been (7.7 years). "Rounding down," counsel argued, "taking into account that Concetta could have lived at least an additional 6 years," it would be "fair" for the jury to award Salvatore and Roseanne each $100,000 per year for the loss of society they suffered as a result of Concetta's early demise. In addition, counsel argued that Concetta's estate should be awarded: (1) $75,000 for Concetta's loss of normal life expectancy and for the pain and suffering she experienced

24

between the colonoscopy and the day she died in the hospital; (2) $10,500 for the funeral expenses; and (3) 20,000 for the hospital bills incurred between Concetta's colonoscopy and her death.

¶ 84     In response, in his closing argument, counsel for the defendant argued that Dr. Sublette never deviated from the proper standard of care and that four physicians, including Dr. Mattis, Dr. Villasuso, Dr. Zuehlke and Dr. Goldberg, opined that Dr. Sublette's decision to perform the colonoscopy was medically acceptable and understandable under the particular circumstances of Concetta's case. As to damages, counsel for the defendant stated:

> "I have no comment to make, nothing to say about the damages that were outlined there. There will be an instruction that the judge will read to you that says that if you decide for the defendant on the question of liability, you will have no occasion to consider the question of damages. In other words, if you decide, as I believe you should, under the evidence, find in favor of Dr. Sublette, you do not even discuss nor consider the question of the money that's being asked for here. "

¶ 85     In rebuttal closing argument, counsel for the plaintiff introduced a damages chart. [4] Defense counsel objected on the ground that he never made any comment about damages, but the court overruled the objection, finding that counsel's "no comment" regarding damages was in fact a "comment," inviting the damages chart. Plaintiff's counsel then argued in rebuttal closing argument that defense counsel's failure to argue with the amount of monetary damages requested by the plaintiff was evidence that the defense, in fact, believed that those damages were reasonable.

¶ 86                              L. Jury Instructions

---

[4] The record does not contain this damages chart.

¶ 87      After closing arguments, the court instructed the jury. The following relevant instructions were tendered to the jury prior to the deliberations. With respect to the cause of action, the jury was instructed in the following manner:

"The plaintiff claims that Concetta Cimino, deceased was injured and sustained damage, and that the defendants were negligent in the following respect:

Performed a colonoscopy on Concetta Cimino at the time when she was experiencing an acute diverticulitis attack.

The plaintiff further claims that the negligence of the defendant was a proximate cause of her injuries and ultimate death.

The defendant denies that he was negligent in performing a colonoscopy at the time that he did.

The defendant denies that he was negligent in doing anything claimed by the plaintiff."

¶ 88      With respect to causation, the jury was instructed as follows:

"More than one person may be to blame for causing an injury. If you decide that the defendant was negligent and his conduct was a proximate cause of injury to the plaintiff, it is not a defense that some third person who is not a party to the suit may also have been to blame. However, if you decide that the sole proximate cause of injury to the plaintiff was the conduct of some person other than the defendant, then your verdict should be for the defendant."

In addition, the jury was instructed:

"[if] you decide that the defendant was negligent and that his negligence was a proximate cause of injury to the plaintiff, it is not a defense that something else may also have been a cause of the injury. However, if you decide that the sole proximate cause of injury to the

plaintiff was something other than the conduct of the defendant, then your verdict should be for the defendant."

The court defined "proximate cause" in the following manner for the jury:

"When I use the expression 'proximate cause' I mean a cause which, in the natural or ordinary course of events, produced the plaintiff's injury. It need not be the only cause, nor the last or nearest cause. It is sufficient if it combines with another cause resulting in the injury."

¶ 89    With respect to the burden of proof, the jury was instructed as follows:

"The plaintiff has the burden of proving each of the following propositions as to the defendant:

First, that the defendant acted or failed to act in one of the ways claimed by the plaintiff as stated to you in these instructions and that in so acting, or failing to act, the defendant was negligent;

Second, that the plaintiff was injured;

Third, that the negligence of the defendant was a proximate cause of the injury to the plaintiff.

If you find from your consideration of all the evidence that each of these propositions has been proved, then your verdict should be for the plaintiff. On the other hand, if you find from your consideration of all of the evidence that any of these propositions has not been proved as to the defendant, then your verdict shall be for the defendant."

In addition, the instructions defined the "burden of proof" by explaining to the jury that they needed to be "persuaded *** that the proposition on which [the party] has the burden of proof is more probably true than not true."

¶ 90        With respect to damages the jury was provided with the following instructions.  First, the jury was instructed that if they decided "for the defendant on the question of liability, [they would] have no occasion to consider the question of damages."  Next, the jury was provided with several instructions explaining how they were to determine damages.  With respect to the claims of Concetta's "next of kin" the jury was instructed as follows:

> "If you decide for the plaintiff on the question of liability, you must then fix the amount of money which will reasonably and fairly compensate the son and daughter of the decedent for the pecuniary loss proved by the evidence to have resulted to them from the death of the decedent.  'Pecuniary loss' may include loss of money, benefits, goods, services, and society.
>
> In determining pecuniary loss, you may consider what the evidence shows concerning the following:
>
> 1.  What benefits the decedent customarily contributed in the past;
>
> 2.  What benefits the decedent was likely to have contributed in the future;
>
> 3.  Her age;
>
> 4.  Her physical and mental characteristics;
>
> 5.  Her habits of industry and sobriety;
>
> 6.  The grief, sorrow and mental suffering of the next of kin;
>
> 7.  The relationship between the next of kin and the decedent.
>
> Where a decedent leaves lineal next of kin, the law recognizes a presumption that the lineal next of kin have sustained some substantial pecuniary loss by reason of the death.  The weight to be given this presumption is for you to decide from the evidence in the case."

¶ 91        The jury was also instructed that in assessing the aforementioned damages it could consider

how long the next of kin, namely Salvatore and Roseann, would be likely to sustain pecuniary loss as a result of Concetta's death, considering how long Concetta was likely to have lived and how long each of them respectively was likely to live. The instructions provided the jury with the table of mortality that was in evidence, noting that the life expectancy of a 59-year-old male is 21.69 years; that the life expectancy of a 62-year-old female is 22.31 years, and that the life expectancy of an 83-year-old female is 7.7 years. The instruction warned, however, that "[t]hese figures are not conclusive" but, rather, are "the average life expectancies of persons who have those ages." In addition, the instruction declared that "Damages for loss of society are not reduced to present cash value."

¶ 92     The jury was further instructed that in determining "pecuniary loss" under this count they were not permitted to consider: (1) Concetta's pain and suffering; and (2) the poverty or wealth of her next of kin. In addition, they were provided with the definition of "society" as "the mutual benefit that each family member receives from the other's continued existence, including love, affection, care, attention, companionship, comfort, guidance, protection, and grief and sorrow."

¶ 93     With respect to the claims of Concetta's estate, the jury was instructed in the following manner:

"If you decide for the plaintiff on the question of liability, you must then fix the amount of money which will reasonably and fairly compensate the estate for any of the following elements of damages proved by the evidence to have resulted from the negligence of the defendant during the period of time between the time of the decedent's injuries and the time of her death taking into consideration the nature, extent, and duration of the injury:

1.  Loss of normal life experience. When I use the expression 'loss of normal life' I mean the temporary or permanent diminished ability to enjoy life. This includes a person's inability to pursue the pleasurable aspects of life.

2.  The pain and suffering experienced as a result of the injuries.

3.  The reasonable expenses of necessary medical care, treatment and funeral expenses.

Whether any of these elements of damages has been proved by the evidence is for you do [sic] determine."

¶ 94    Finally, the jury was provided with two verdict forms, and instructed to use verdict form A, if it found in favor of Salvatore, as administrator of Concetta's estate, or verdict form B if it found in favor of Dr. Sublette. Verdict form A, to be used by the jury should it find in favor of the plaintiff explicitly included the following statement: "We assess the damages in the sum of:" followed by a blank line for "Total" as well as two blank lines for the following "Itemized" damages: (1) "Count I: loss of society of Concetta on behalf of Salvatore and Roseann"; and (2) "Count II: Concetta's loss of normal life, pain and suffering, reasonable expense of necessary medical care, treatment and funeral expenses."

¶ 95                              M.  Jury Verdict

¶ 96    After deliberations,[5] the jury returned verdict form A, finding in favor of the plaintiff

---

[5] We note that we are without that part of the trial transcript wherein the jury's verdict was read in open court.

Salvatore, as administrator of Concetta's estate, and against the defendant, Dr. Sublette.

However, in assessing the damages, the jury placed "$0.00" in each of the blank lines on verdict

form A.   On April 12, 2013, the court entered judgment on the verdict.

¶ 97                                    N.  Posttrial Proceedings

¶ 98        On May 10, 2013, counsel for plaintiff filed a motion seeking a new trial on damages,

contending that the jury had failed to follow the jury instructions and award the proven: (1)

pecuniary damages (740 ILCS 180/2 (West 2010)); and (2) medical and funeral expenses.  In its

reply, the defendant asserted that the jury's verdict was not against the manifest weight of the

evidence but was legally consistent and that the jury could have reasonably concluded that the

defendant breached the standard of care but that any claimed damages were the result of

someone or something other than his conduct.  In a footnote of its reply, the defendant

alternatively argued that if the court were to vacate the judgment and order a new trial that trial

should be on all the issues, including liability and not limited to damages.  Because this issue

was presented in a footnote and not fully argued, after hearing oral arguments on the plaintiff's

motion, on September 9, 2013, the trial court permitted the parties further briefing on this issue.

¶ 99        After the parties obliged and submitted supplemental briefs, the court held another hearing on

October 3, 2013.  After hearing arguments by the parties, the court granted in part the plaintiff's

motion and vacated the judgment of the jury, setting the cause for a new trial on all issues,

including liability.  In doing so, the court reasoned that "this jury did conflate the two issues of

liability and damages," and concluded that a trial on all issues was "the only appropriate

remedy."  The defendant, Dr. Sublette, now appeals.

¶ 100                                   II.  ANALYSIS

¶ 101       On appeal, the defendant argues that the trial court abused its discretion in vacating the

the judgment of the jury and setting the cause for a new trial on all issues. Citing to *Kleiss v. Cassida*, 297 Ill. App. 3d 165 (1998), the defendant argues that the jury's verdict in favor of the plaintiff, but awarding zero damages was consistent and should have been permitted to stand. The plaintiff, on the other hand, argues that the jury failed to properly follow the jury instructions, because under those instructions and the evidence presented at trial, once the jury determined that the defendant breached the standard of care which proximately caused Concetta's death, it was required to award some damages, in the very least, for the undisputed medical and funeral expenses. Accordingly, the plaintiff asks that we affirm that part of the trial court order setting the cause for a new trial on damages, but reverse that part ordering a retrial on all issues. For the reasons that follow, we affirm the judgment of the circuit court.

¶ 102    We begin by addressing the standard of review. When presented with a motion for a new trial, the circuit court will weigh the evidence and order a new trial if the verdict is contrary to the manifest weight of the evidence. *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 38 (citing *Maple v. Gustafson*, 151 Ill. 2d 445, 454 (1992)). A verdict is against the manifest weight of the evidence only where the opposite result is clearly evident or where the jury's findings are unreasonable, arbitrary and not based upon any of the evidence. *Lawlor*, 2012 IL 112530, ¶ 38 (citing *Maple*, 151 Ill. 2d at 454). When the central issue on a motion for a new trial is damages, the trial court may order a new trial when the damages awarded by the jury are manifestly inadequate, it is clear proved elements of damages have been ignored, or the amount awarded bears no reasonable relationship to the loss suffered by the plaintiff. *Poliszczuk v. Winkler,* 387 Ill. App. 3d 474, 490 (2008); *Snover v. McGraw*, 172 Ill. 2d 438, 447 (1996); see also *Kleiss*, 297 Ill. App. 3d at 175; *Tindell v. McCurley*, 272 Ill. App. 3d 826, 830 (1995). A reviewing court may not set aside a trial court's ruling on a motion for a new trial unless the trial

court abused its discretion. *Lawlor*, 2012 IL 112530, ¶ 38 (citing *Maple*, 151 Ill. 2d at 454). An abuse of discretion occurs when the trial court's ruling is arbitrary, fanciful, or unreasonable, or when no reasonable person would take the same view. See *Doe v. Weinzweig*, 2015 IL App (1st) 133424, ¶ 20; *Favia v. Ford Motor Co.,* 381 Ill. App. 3d 809, 816 (2008). In reviewing the trial court's order granting a new trial, we must remember that in deciding the motion the trial judge had "the benefit of his previous observation of the appearance of the witnesses, their manner in testifying, and of the circumstances aiding in the determination of credibility." (Internal quotation marks omitted). *Maple*, 151 Ill. 2d at 456. Accordingly, we will not reverse the trial court's order for abuse of discretion unless the record affirmatively shows that "there [was] sufficient evidence to support the verdict of the jury." *Maple*, 151 Ill. 2d at 456

¶ 103      In the present case, for the reasons that follow, we find that the trial court did not abuse its discretion in ordering a new trial. The record reveals that the zero damages award was against the manifest weight of undisputed evidence presented at trial. The jury here was presented with a choice of two verdict forms: (1) form A, under which it could find for the plaintiff and award damages; and (2) form B, under which it could find for the defendant. The jury instructions explicitly advised the jury that if it chose to sign verdict form A, instead of B, it was required to determine the amount of damages to be awarded to the plaintiff. Verdict form A itemized those damages into two categories, namely: (1) pecuniary loss (*i.e.*, loss of society of Concetta on behalf of her children); and (2) economic loss (*i.e.*, Concetta's normal life, pain and suffering, reasonable expense of necessary medical care treatment and funeral expenses).

¶ 104      While we agree with the defendant that a zero award for pecuniary damages could be reconciled with a finding of liability, we cannot say the same for the jury's refusal to award any damages for medical and funeral expenses. Under the evidence presented at trial (namely, the

testimony of Concetta's children and several physicians) the jury was at liberty to determine what amount, if any, of pecuniary damages should be awarded to Concetta's son and daughter arising from their loss of her society. Although pecuniary damages are premised upon a rebuttable presumption that the surviving next of kin would have had a reasonable expectation of benefits from the continuation of the life of the deceased, that presumption is rebuttable and may be disregarded by the jury if it determines that the facts do not support it. *Watson v. South Shore Nursing & Rehabilitation Center, LLC*, 2012 IL App (1st) 103730, ¶ 36. For instance, the presumption is rebuttable where: (1) the kin were estranged from the deceased, because, in such a case, there would be no benefits derived from the continuation of her life; or (2) where the deceased would have died from unrelated causes because, in that instance, even absent the defendant's wrongful conduct, there would be no continuation of life from which to derive benefits. *Watson*, 2012 IL App (1st) 103730, ¶ 36. Accordingly, depending on their assessment of the testimony of Concetta's children, as well as the testimony of Dr. Villasuso regarding Concetta's other ailments and the imminent necessity for surgery, regardless of whether the colonoscopy were preformed, the jury here, was at liberty to assess the pecuniary damages at zero.

¶ 105    However, contrary to the defendant's position, the same zero award for medical and funeral expenses incurred by Concetta's estate is inexplicable where the evidence of those expenses was stipulated to and undisputed at trial. The record below reveals that the parties read into evidence, without objection, the amount of funeral expenses ($10,500) and medical expenses related to Concetta's treatment from the time of the colonoscopy to her death ($20,853.35) incurred by the estate. No evidence by defense counsel was presented to counter these facts and no argument made against their award in closing. As such, the jury's award of zero damages for losses to the

estate could not be reconciled with its finding of liability on part of the defendant. Accordingly, that zero award was against the manifest weight of the evidence and the judge was well within his discretion to remand for a new trial. See, *e.g.*, *Tindell*, 272 Ill. App. 3d at 830 (holding that a new trial was appropriate where, *inter alia*, the evidence of the plaintiff's medical expenses was undisputed at trial, but the jury nevertheless entered a verdict finding in favor of the plaintiff and awarding no damages); see also *Theofanis v. Sarrafi*, 339 Ill. App. 3d 460, 474-75 (2003) (holding that retrial was necessary where the jury's verdict formally found the physician acted negligently and his negligence caused the plaintiff's damages, but awarded zero damages).

¶ 106    In reaching this conclusion, we have reviewed the decision in *Kleiss,* 297 Ill. App. 3d 165, cited to by the defendant and find that case inapposite.

¶ 107    In *Kleiss*, like here, the jury returned a verdict in favor of the plaintiffs on their negligence claim but awarded the plaintiffs zero damages. *Kleiss*, 297 Ill. App. 3d at 175. The plaintiffs sought a new trial, arguing the jury's finding of liability against the defendant included, by definition, a finding of damages. *Kleiss*, 297 Ill. App. 3d at 175. The trial court disagreed and the appellate court affirmed, stating:

"Plaintiffs would have us assume the only possible interpretation of the jury's verdict was that the jury found plaintiffs had proved each element of their negligence claim, duty, breach of duty, causation, and damages, but the jury mistakenly failed to award damages. The more logical conclusion is that the jury found [defendant] had breached his duty to plaintiffs *** but either that [defendant's] negligent spraying was not a proximate cause of plaintiffs injury or plaintiffs did not sustain damage as a result of [defendant's] negligence. In this case, the jury found for [defendant], but simply used the wrong verdict form." *Kleiss*, 297 Ill. App. 3d at 176.

¶ 108    In coming to this decision, the court in *Kleiss*, however, specifically noted that the jury: (1) had assessed damages against every other defendant in that case, showing that it knew how to assess damages; (2) returned a verdict that was not against the manifest weight of the evidence; and (3) specifically asked during jury deliberations whether it had to award monetary damages if it found a party negligent, to which the court replied "no." *Kleiss*, 297 Ill. App. 3d at 176-77. Thus, the court in *Kleiss*, found that under the very particular set of circumstances in that case, the jury's intent to award the plaintiffs zero damages was "crystal clear" and the trial court did not abuse its discretion in denying a new trial. *Kleiss*, 297 Ill. App. 3d at 176.

¶ 109    Unlike in *Kleiss*, in the present case, there is nothing in the record to indicate that the jury knew how to assess damages, or that it was instructed that it could find the defendant liable and yet award zero damages. On the contrary, the jury instructions presented to the jury explicitly instructed that were the jury to find "in favor of the plaintiff on the question of liability, [it] *must* then fix the amount of money which will reasonably and fairly compensate," *inter alia*, the estate for reasonable expense of necessary medical care, treatment and funeral expenses that resulted from the negligence of the defendant. (Emphasis added.)  Accordingly, *Kleiss* is distinguishable.

¶ 110    We similarly reject defendant's repeated assertion during oral argument that the decision of our supreme court in *Flynn v. Vancil*, 41 Ill. 2d 236, 240 (1968), supports his position that the jury's verdict "of no damages is not inconsistent with a finding of liability."  Unlike the present case, which involves stipulated medical and funeral expenses, *Flynn* dealt with the issue of whether the presumption of substantial pecuniary loss to lineal kindred in a wrongful death case is rebuttable so as to warrant a jury verdict finding liability but awarding no damages. *Flynn*, 41 Ill. 2d at 237.  In that case, our supreme court held that it was within the province of the jury to determine that the defendant had negligently caused the automobile accident that resulted in the

36

two-week-old child's death, but nonetheless awarded zero damages for pecuniary loss, where it was "uncontroverted that plaintiff's decedent was a two-week-old child afflicted with an incurable congenital condition affecting her health." *Flynn*, 41 Ill. 2d at 238. While we entirely agree with the logic of *Flynn*, we find it irrelevant to the situation here, where, as already discussed above, no evidence was offered and no argument made to negate the stipulated medical and funeral expense incurred by the decedent's estate so as to permit the jury's zero award for those damages.

¶ 111    Having thus found that the jury's damages award was against the manifest weight of the evidence, we must next address the plaintiff's argument that the trial court should have ordered a new trial solely on damages. A new trial on damages alone may be granted where: (1) the jury's verdict on the question of liability is amply supported by the evidence; (2) the question of damages and liability are so separate and distinct that a trial limited to the question of damages is not unfair to the defendant; and (3) the record suggests neither that the jury reached a compromise verdict or that the error which resulted in the jury's awarding inadequate damages also affected the jury's finding of liability. *Theofanis*, 339 Ill. App. 3d at 473.

¶ 112    In the present case, the plaintiffs cannot meet the third prong. As already noted above, the jurors here unmistakably were given a choice between two verdict forms, form A, under which they could find for the plaintiff and award damages, and form B, under which they could find for the defendant. The jurors chose and all signed verdict form A, finding for the plaintiff, thereby evidencing that they believed that the defendant had breached the standard of care and proximately caused the decedent's injuries. Nevertheless, the jury awarded zero damages. "While a verdict of zero damages is proper if there is evidence no damages were suffered, an award of damages that does not bear a reasonable relationship to the evidence is an indication of

37

a compromise verdict." *Winters v. Kline*, 344 Ill. App. 3d 919, 926 (2003). As already discussed above, the evidence at trial unequivocally established that the parties stipulated to and did not dispute the amount of medical and funeral expenses incurred. As such, from the record, we are unable to determine whether the jury found liability at all, whether it failed to understand or simply follow the jury instructions, or whether, alternatively, it reached a compromise verdict. See, *e.g.*, *Tindell*, 272 Ill. App. 3d at 830.

¶ 113    In coming to this conclusion we are guided by the decisions in *Tindell* and *Theofanis*. In *Tindell*, the plaintiff brought a claim against a general contractor after falling from a stepladder on a construction job. *Tindell*, 272 Ill. App. 3d at 827. The jury returned a verdict in favor of the plaintiff but awarded the plaintiff no damages. On appeal, this court held that a retrial on damages alone was inappropriate and instead remanded the cause for a new trial on all issues. *Tindell*, 272 Ill. App. 3d at 827. In doing so, the court explained:

> "[B]ecause of the nature of the jury's verdict there is no way--other than an absolute guess--for this court to say whether the jury found liability. The verdict form was filled in by the jury with zero damages for four separate categories of damages despite uncontradicted evidence plaintiff suffered some damages from the accident. However, to say the jury meant to find for defendant on the issue of liability, we would have to assume the jury ignored the instructions both as to which verdict form to use and that there would be no occasion to consider damages if it found for defendant." *Tindell*, 272 Ill. App. 3d at 830-31.

¶ 114    Similarly, in *Theofanis*, plaintiff, the husband of a patient who suffered a stroke, brought a malpractice action against the physician and health care service corporation for failing to inform him of test results that showed a mass in the patient's heart prior to her stroke. *Theofanis*, 339 Ill.

App. 3d at 464-65. After the jury found both defendants liable but assessed zero in damages, all parties filed posttrial motions. *Theofanis*, 339 Ill. App. 3d at 469. The circuit court denied the plaintiff's motion for a new trial and, *inter alia*, amended the verdict in favor of the physician, concluding from the award of zero damages that the jury found that the physician's acts did not proximately cause the injury. *Theofanis*, 339 Ill. App. 3d at 469-70. The plaintiff appealed, asserting, among other things, that the court should have granted a new trial on damages alone. *Theofanis*, 339 Ill. App. 3d at 473. The appellate court disagreed, and remanded the cause for a new trial on all issues. *Theofanis*, 339 Ill. App. 3d at 475. In doing so, the court found that the jury's verdict was simply "internally inconsistent." *Theofanis*, 339 Ill. App. 3d at 475.

> "The choice of verdict form B shows that all jurors agreed that [the physician's] negligence proximately caused damages to [the patient]. *** The jurors also agreed, by signing a verdict awarding $0 in damages, that plaintiffs did not prove that [the physician] negligently caused their damages." *Theofanis*, 339 Ill. App. 3d at 474.

Under these circumstances, the court in *Theofanis*, held that the record strongly suggested that the jury had reached a compromise verdict, *i.e.*, that "those who believed [the physician] negligently harmed [the patient] gave up the assessment of damages in exchange for the other jurors' signature on a formal finding of negligence and liability." *Theofanis*, 339 Ill. App. 3d at 474. Accordingly, relying on *Tindell*, the court in *Theofanis* reversed and remanded for a trial on all issues.

¶ 115    We agree with the rationale of *Tindell* and *Theofanis*, and find that we may only speculate as to the jury's intent. From the record before us, it is impossible to determine whether the jury here found proximate cause but disregarded or failed to understand the jury instructions, or whether it purposely reached a compromise verdict. In either event, under these facts, we find that the trial

court did not abuse its discretion in vacating the verdict, as inconsistent, and setting the cause for a new trial on all issues.

¶ 116                                  III.  CONCLUSION

¶ 117      For the aforementioned reasons, we affirm the judgment of the circuit court.

¶ 118      Affirmed.